# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHITNEY GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04618-TWP-DLP |
| | ) | |
| COMMUNITY HEALTH NETWORK, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Community Health Network ("CHN") (Filing No. 45). Plaintiff Whitney Griffin ("Griffin") filed this lawsuit after she was terminated from her employment at CHN. In her Complaint, Griffin asserts claims for racial discrimination and retaliatory termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C § 1981 ("Section 1981") (Filing No. 1). CHN seeks judgment as a matter of law asserting that Griffin's termination was neither discriminatory nor retaliatory and that there are no disputed issues of material fact. For the following reasons, the Motion is **granted in part and denied in part.**

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Griffin as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

Griffin is an African-American woman who resides in the Southern District of Indiana. (Filing No. 1 at 1–2). She began working for CHN as a temporary medical assistant in June 2013. (Filing No. 47-1 at 4). In January 2017, she was hired as a full-time Medical Assistant at CHN's

Stones Crossing Health Pavilion located in Greenwood, Indiana ("Stones Crossing"). *Id.* at 9. Griffin was the only African-American medical assistant at Stones Crossing during her 2017–2019 employment period (Filing No. 47-2 at 18; Filing No. 51-1 at 1). As a Medical Assistant, Griffin directly reported to the Practice Manager (Filing No. 51-2 at 4). Her job description indicated that she would report to the "Practice Administrator/Manager and/or Clinical Supervisor." (Filing No. 51-4 at 2.) Below the Practice Manager, the Clinical Supervisor and Operations Supervisor had lesser supervisory roles over the Medical Assistants but were integral to the decision-making of the staff (Filing No. 51-2 at 4). Medical Assistants at Stones Crossing supported a specific physician and only worked with that physician's patients. *Id.*

Griffin initially reported to Scott Sappenfield ("Sappenfield") from January 2017 until December 2018 when Sappenfield resigned (Filing No. 47-2 at 4). Her work performance prior to January 2019 was evaluated positively by Sappenfield during the time when he was her supervisor. (Filing No. 47-1 at 5.) In fact, Sappenfield characterized Griffin as "demonstrat[ing] a high degree of clinical proficiency [and], personal integrity," and stated that Griffin "worked well with others." (Filing No. 51-6 at 1.) While employed by CHN, Griffin was never written-up and never received any disciplinary actions at the Stones Crossing site (Filing No. 47-4 at 8).

The Group Practice Director, Stacey Sharp ("Sharp"), assumed the role of interim Group Practice Manager, along with her other duties, in October 2018 prior to Sappenfield's resignation. *Id.* Amanda Ennis ("Ennis") was the Stones Crossing Clinical Supervisor. *Id.* at 3. Karen Chenoweth ("Chenoweth") was the Operations Supervisor (Filing No. 51-2 at 4). Dr. Yousef Mohammadi ("Dr. Mohammadi") was the physician that Griffin supported. *Id.*

Griffin's time at Stones Crossing was marked by some instances of work-related conflict and race-based issues that either directly involved Griffin and her coworkers or was witnessed by

Griffin ([Filing No. 47-1 at 13](#)). In one instance, Griffin walked in on an ongoing conversation between a Caucasian coworker, Daniel Falks ("Falks"), and a coworker of Hispanic descent and witnessed Falks remark about "how people should return over the border." *Id.* Griffin also witnessed Falks intimidate another coworker but, to Griffin's knowledge, he received no form of corrective action. *Id.* at 37. In another instance, a coworker named Jamea Stetser ("Stetser"), told Griffin that she should "know [her] place," which Griffin interpreted to be a racial comment. *Id.* at 7. Griffin also experienced negative race-based comments from patients. *Id.*

Griffin's previous Practice Manager, Sappenfield, confirmed an environment of "rampant racial bias" at Stones Crossing that was demonstrated by some of Griffin's "peers and superiors." ([Filing No. 51-6](#).) Sappenfield specifically named Ennis and Stetser for their "fear-based" reactions to Griffin as an African-American woman. *Id.* Sappenfield pointed out that Griffin was the "only African-American staff member, and diversity was very difficult to achieve in the geographical area [where] Stones Crossing is located." *Id.* As a result of concerns raised by Griffin to Sappenfield about issues she felt were race-based, Sappenfield spoke individually with Stetser and Ennis about these issues before his December 2018 resignation ([Filing No. 47-1 at 15](#), 18).

On December 26, 2018, a Caucasian coworker named Teresa Haney ("Haney") informed Griffin that she planned to send a patient's medical records to a hotel fax machine, which violated the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.* at 22. After Griffin informed Haney of the HIPAA restrictions, Haney began to "verbally attack" Griffin in a manner that was unsuitable for the workplace, although Haney did not use any race-related language during the barrage. *Id.* Griffin immediately informed Ennis, the Clinical Supervisor, and Dr. Mohammadi, the physician Griffin supported. *Id.* Griffin believes Ennis did nothing about the situation with Haney after Griffin reported it to her. *Id.*

The next day on December 27, 2018, Griffin asked another Caucasian coworker, Candace Van Valkenburg ("Van Valkenburg"), a question about a work-related matter and was "verbally attacked." *Id.* at 23. Van Valkenburg proceeded to yell at Griffin, although Griffin could not recall whether race-related language was used. *Id.* Following this episode, Griffin reported the exchange to Clinical Supervisor Ennis and Operations Supervisor Chenoweth. *Id.* at 24.

On January 3, 2019, Ennis and Chenoweth conferred with Griffin and informed her that they spoke with the women in the Stones Crossing call center (where Haney and Van Valkenburg were stationed), and Ennis and Chenoweth told Griffin that her face was "scary and intimidating." *Id.* When Griffin questioned the pair about what their comment meant, Griffin was told that she "came off strong." *Id.* Griffin felt the comment was race-related and meant to stereotype her as "an angry Black woman." *Id.* During the discussion, Ennis informed Griffin that she should only communicate with her coworkers through CHN's online internal messaging system ("Jabber") because of Griffin's facial expressions. *Id.* Jabber was not a common or effective way to communicate within Stones Crossing. *Id.* at 19.

On January 4, 2019, because of her experiences at Stones Crossing, the episodes with Haney and Van Valkenburg, and the comments made to her during the conference with Ennis and Chenoweth, Griffin filed a complaint for racial discrimination with CHN's Human Resources office ("HR"). *Id.* at 24. Five Employee Relations Specialists worked within HR and reported to the Director of Employee Relations, Diane Reynolds ("Reynolds") (Filing No. 51-3 at 3). Employee Relations Specialist Isabel Fawcett ("Fawcett") was assigned Griffin's racial discrimination complaint and conducted intake with her. *Id.* at 6. Fawcett began an investigation of Griffin's racial discrimination complaint on January 4, 2019, and developed questions and potential interview subjects based on the information Griffin provided. *Id.* at 7. While Griffin

named multiple people in her complaint, Ennis was listed as the complaint's subject. *Id*. at 8. Immediately after receiving Griffin's complaint, Fawcett informed interim Practice Manager Sharp and Ennis that an investigation of Griffin's racial discrimination complaint had commenced. *Id*. at 7–8.

The next day, Saturday, January 5, 2019, Chenoweth sent an mail to Sharp and Ennis with the subject line "Ongoing Problem" and described coming across the public social media post of the previous Practice Manager, Sappenfield, that seemed to denigrate Stones Crossing's current leadership (Filing No. 51-8 at 2). In her email, Chenoweth stated that "people in our office that are difficult to work with," which was ostensibly about Griffin, and stated the words that have been used to describe these "difficult to work with" people were "bully, intimidating, superior, hostile, scary, and many other colorful words." *Id*. Sharp responded to the message and copied Fawcett on the email, telling Chenoweth and Ennis, "I am copying Isabel on this correspondence as it relates to the concern and ongoing investigation with Whitney Griffin's complaint." *Id*. Fawcett requested copy of the Facebook posting and Sharp instructed Chenoweth (and copied Fawcett and Ennis) to include the posting in her investigation (of Whitney Griffins complaint), "as these are public posts for the former Practice Administrator … and documented mentor (also posted public on social media) of Whitney Griffin." *Id*. at 1. In part, Sappenfield's posting stated the following:

> For my old work family at Stones Crossing Health Pavilion. You deserve good leadership so please demand it and don't settle if they don't deliver. DO NOT accept racism or any kind of discrimination from your colleagues, supervisors, or directors. DO NOT be afraid to declare without parameters that you deserve a environment that is safe, welcoming, and treats everyone with respect.
>
> …

(Filing No. 58-1 at 5.)

On Monday morning, January 7, 2019, Sharp informed Griffin that she wanted to meet with her regarding a verbal complaint lodged against Griffin by another coworker regarding Griffin's "message delivery" and concerns about language that Griffin had used in the office (Filing No. 47-2 at 10). Griffin remarked that she felt she was being targeted and informed Sharp that she would not discuss anything further until HR was present. *Id.* Sharp agreed and informed Griffin she would reschedule the meeting. *Id.* Griffin initially agreed to attend the meeting, but when Sharp sent the email meeting invitations, Griffin declined the electronic invitation at least twice. *Id.* at 11. Griffin declined the invitations because she wanted someone from HR other than Fawcett to be present for the meeting.

Sharp emailed Fawcett seeking advice on how to handle the situation if Griffin chose to not attend the meeting, and Fawcett advised Sharp to issue Griffin a "warning for insubordination." (Filing No. 51-11 at 1.) Fawcett suggested that Sharp should inform Griffin that refusal to attend any meeting called by the leadership team would be considered an act of insubordination. *Id.* That afternoon, Fawcett informed Griffin that she had concluded her investigation of Griffin's HR complaint for racial discrimination and informed Griffin the feedback she received from five of the six interview subjects was that Griffin was "difficult to work with." (Filing No. 51-3 at 11.) On January 4, 2019 and January 7, 2019, Fawcett spoke with at least six employees, including Sharp, Ennis, and Haney regarding Griffin's racial discrimination complaint. *Id.* Fawcett relayed to Griffin the multiple comments made about her and stated, "While you may not agree with the perceptions shared, they offer an opportunity for reflection on how you may come across to others, which has nothing to do with your race." (Filing No. 51-16 at 1.) Griffin was also advised to "improve her working relationship with others." *Id.* Griffin responded to the email shortly after and stated that she would "just contact the" U.S. Equal Employment Opportunity Commission

("EEOC"), implying she would file a charge of discrimination against CHN with that federal agency. *Id*.

Fawcett sent Sharp the results of her investigation as well as the email that was sent to Griffin (Filing No. 51-9 at 1). Fawcett then sent her supervisor, Reynolds, a copy of the email sent to Griffin and Sharp and stated, "This is the person who said she might be filing an EEOC complaint, as encouraged by her former manager who . . . posted scathing comments on Facebook about the current leadership." *Id*. Fawcett informed Reynolds that she persuaded Sharp, Ennis, and Chenoweth to ignore the concerns over the social media post and focus on "work performance issues and insubordination only." *Id*. Fawcett also informed Reynolds of the morning's back-and-forth between Sharp and Griffin regarding Griffin's request to have HR "in the room" during the scheduled meeting and told Reynolds, "I am not going to give in to her demands, so I will join by telephone conference call". *Id*. Fawcett concluded the email to Reynolds by telling her, "It is my judgement [sic] based on the investigatory findings that they need to get her escalating behavior under control in order to manage effectively." *Id.*

The next morning, before 9:00 a.m. on January 8, 2019, Griffin was informed by Sharp that a meeting with HR (regarding the verbal complaint lodged against Griffin) would begin at 10:00 a.m. that same day (Filing No. 47-1 at 31; Filing No. 51-12 at 3). Griffin reiterated her preference for HR to be present and Sharp informed her that HR would be available via telephone. *Id*. S harp told Griffin that Fawcett would be the HR person to attend the meeting via telephone, and Griffin informed Sharp she was uncomfortable with Fawcett being the Employee Relations Specialist to attend the meeting because of her "lack of investigation" with Griffin's racial discrimination complaint that was concluded by Fawcett the day before. *Id.* at 32. Sharp informed Griffin that she was advised by HR to write Griffin up for insubordination if Griffin did not attend

the meeting. *Id*. Griffin became emotional and began crying. *Id*. Sharp described Griffin as "extremely agitated" and Griffin informed her that Sharp was "only doing this because she filed a racial profiling case." ([Filing No. 47-2 at 2](.).)

Griffin left the room with Sharp and sought Ennis, the Clinical Supervisor, and explained that she needed a "mental health day," asked for permission to leave, and Ennis granted her permission by stating "okay" ([Filing No. 47-1 at 33](–34)).  Before leaving, Griffin found coverage for her patients by asking coworker Chris Millberry ("Millberry") to cover her remaining shift for the day[1].  *Id.*  Griffin informed Dr. Mohammadi of what transpired with Sharp and told him that Millberry was her coverage.  *Id*. at 34.  Dr. Mohammadi agreed with her request to leave and told her to "[G]o reset. Come back tomorrow and . . . we'll see what goes from there."  *Id.*  At some point before leaving that morning, Griffin informed Sharp that she would be going to HR to report Sharp about the events that just occurred.  *Id.* at 35.

Unbeknownst to Griffin, during the entire discussion with Sharp, Sharp was exchanging emails with Fawcett ([Filing No. 51-12](.)). Sharp informed Fawcett that Griffin "asked for Barb Hybarger [sic] (my one-up) phone number and walked out. Said I would have to find someone to cover Dr. Booth's patients. The clinical and operations supervisors are working on coverage." *Id.* at 3.  Fawcett responded, "[r]egarding the coverage if she's in a meeting, let her know the clinical and operations supervisors are working on it." *Id.* at 2.  Sharp told Fawcett that she had inadvertently referred to "Dr. Booth" in the previous email and that "coverage for Dr. Mohammadi is taken care of."  *Id*.  Sharp told Fawcett that Griffin had come in and out of the room during their discussion "several times" and remarked that Griffin was "extremely hostile" and was "heading to

---

[1] CHN disputes Griffin's version of these facts, but as required, the facts are presented in the light most favorable to Griffin as the non-moving party.

the business office to report her." *Id.* Sharp was instructed by Fawcett to call security if necessary, and Sharp made clear to Fawcett via email and to Griffin that she would call security on Griffin if need be. *Id.*

Sharp informed Fawcett that Griffin told her that she was uncomfortable with Fawcett serving as the HR person to facilitate the meeting that morning. *Id.* at 1. Fawcett responded to Sharp and told her, "[i]f [Griffin] refuses to attend the meeting, let her know that she is refusing to work and her employment is terminated (after you draft a discharge notice and send it to me for review)." *Id.* Following this exchange between Fawcett and Sharp, Fawcett emailed her supervisor, Reynolds, and stated, "[j]ust an fyi on Whitney's hostility to her manager today and refusal to attend a meeting. She's on the brink of being terminated. (EEOC person[.])" *Id.*

After Griffin clocked out and left the building, Sharp called Griffin and informed her that she was terminated for insubordination and abandoning her job duties. (Filing No. 47-1 at 35, 38.)

On November 20, 2019, Griffin filed her Complaint in this Court alleging violations of Title VII and Section 1981 for racial discrimination and retaliatory termination. (Filing No. 1.)

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and

draw[s] all reasonable inferences in that party's favor." *Zerante,* 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial.*"* *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp*., 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co*., 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc*., 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Griffin, as the non-moving party and draws all reasonable inferences in her favor. *Griffin v. City of Milwaukee*, 74 F.3d 824, 827 (7th Cir. 1996). However, employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ. of City of Chicago, Ill*., 267 F.3d 723, 727 (7th Cir. 2001) (citation and quotation marks omitted).

### III.    DISCUSSION

Griffin asserts in Counts I and II of her Complaint that CHN racially discriminated against her and terminated her employment due to her race in violation of Section 1981 and Title VII ([Filing No. 1 at 3](#)). In Counts III and IV, she asserts that CHN wrongfully terminated her in retaliation for engaging in protected activity, which violates Section 1981 and Title VII. *Id.* CHN moves for summary judgment, maintaining that each of Griffin's claims fails as a matter of law ([Filing No. 45 at 1](#)).  The Court will first address the discrimination claims before turning to the retaliation claims.

### A.    Discrimination

#### 1.    Section 1981

Section 1981 provides equal rights under the law and states that, "All persons within the jurisdiction of the United States shall have the same right . . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981.

To prevail on a claim based on Section 1981, "a plaintiff bears the burden of showing that race was a but-for cause of [her] injury.  And, while the materials the plaintiff can rely on to show causation may change as a lawsuit progresses from filing to judgment, the burden itself remains constant." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014–15 (2020); *see Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–63 (7th Cir. 1990) ("To be actionable, racial prejudice  must be a but-for cause."). At summary judgment, a district court must determine "whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The heightened standard of proof, established by *Comcast Corp.*, 140 S. Ct. at 1015, for plaintiffs bringing discrimination claims under Section 1981 means that Griffin is obliged to plead and demonstrate that but for her race, CHN would not have terminated her employment. When reviewing the facts under the framework established by *Ortiz*, 834 F.3d at 765, the "evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself". *Id.*

The Seventh Circuit has held that a plaintiff can point to circumstantial or direct evidence to demonstrate causation; examples of circumstantial evidence that may "support an inference of intentional discrimination [include] ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs*., 953 F.3d 923, 929 (7th Cir. 2020). Reliance on circumstantial evidence "allows the trier of fact to infer intentional discrimination by the decisionmaker." *Mullin v. Temco Mach., Inc*., 732 F.3d 772, 776 (7th Cir. 2013) (internal citations and quotation marks omitted). "Circumstantial evidence 'must point directly to a discriminatory reason for the employer's action.'" *Mullin*, 732 F.3d. at 777 (quoting *Van Antwerp v. City of Peoria, Ill*., 627 F.3d 295, 298 (7th Cir.2010) (citation and internal quotation marks omitted)).

CHN argues that Griffin provides "insubstantial and unconvincing" evidence to create a reasonable inference that CHN terminated her based on her race and not as a result of Griffin "abandoning her job." (Filing No. 46 at 15–16.) CHN also asserts that Griffin fails to identify any similarly-situated, non-African-American employees who were treated more favorably (Filing No. 46 at 11).

Griffin responds that she can provide circumstantial evidence to prove race discrimination (Filing No. 50 at 8). The circumstantial evidence cited by Griffin consists of the comments made by Ennis and Chenoweth referring to her face as "scary and intimidating," as well as Sharp's repeated warnings that she would call security on Griffin during the charged discussion on the morning of January 8, 2019, despite Sharp's admission that Griffin was crying and never threatened her (Filing No. 50 at 8). Griffin asserts these comments and actions played into a racist stereotype of African-American women as "angry" and prove race discrimination in her termination. *Id.* Griffin cites *Young v. Control Solutions, LLC*, in support of her contention, where a sister court in this Circuit held that "[w]hen a word or concept is so pervasively and enduringly linked to a derogatory stereotype, its use to reference individuals traditionally subject to the stereotype inherently raises the specter of motivation or bias." No. 15-CV-3162, 2017 WL 2633679, at *4 (N.D. Ill. June 19, 2017). Griffin maintains that "[a]lthough the words 'angry Black woman' were not specifically spoken by Sharp, Ennis, or Chenoweth, a jury could reasonably find that their actions . . . played into that stereotype." (Filing No. 50 at 8.)

Griffin also asserts that similarly-situated white employees received better treatment and that she was directed to communicate with her white coworkers via Jabber while white coworkers Haney and Van Valkenburg were "allowed to verbally abuse" her and "were not disciplined." *Id.*

CHN responds that this evidence "would hardly permit a reasonable factfinder to conclude plaintiff's race . . . caused the discharge or other adverse employment action." (Filing No. 55 at 9.) CHN argues that the *Young* case cited by Griffin is "only marginally applicable, if at all, and certainly not determinative to allow Plaintiff's race discrimination claims to proceed" because, in that case, the defendants "repeatedly and specifically referred to plaintiff as 'angry,' which never happened here." *Id.* at 10.

CHN also argues that Haney, Van Valkenburg, and the entire call center staff were instructed by Ennis to use Jabber when communicating with Griffin if they had a patient on the line for her, and therefore, Griffin, Haney, and Van Valkenburg were "treated the same in this regard." *Id*. CHN maintains that "being instructed to use a web-based instant messaging system is hardly the sort of significant change in employment status that constitutes a materially adverse employment action." *Id*. at 11 (citation and quotation marks omitted).

The Court examines Griffin's claims under the "evidence as a whole" framework set by *Ortiz*, and cited by Griffin, and uses the circumstantial evidence presented by Griffin to determine whether Griffin's race was the "but-for" cause of her termination by CHN. Griffin sufficiently pleads the "but-for causation" standard because she succinctly alleges in her Complaint "Defendant, as a result of terminating Plaintiff due to her race, violated 42 U.S.C. § 1981", (Filing No. 1 at 3), however, she fails to demonstrate that her race was the "but-for" cause of her termination and fails to raise a genuine issue of material fact in dispute to allow her race discrimination claims to go forward.

Griffin cites Sharp's consistent warnings that she would call security on her on the morning of January 8, 2019, as evidence a jury could reasonably find to have been racially motivated because Griffin believes it "play[s] into the established stereotype of the 'angry Black woman.'" (Filing No. 50 at 8.) However, Griffin's subjective belief of what Sharp's warnings seemingly meant to reflect is not enough to demonstrate discrimination. *See Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) ("[A] subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination.") (alteration in original). Moreover, Griffin presents no evidence that Sharp ever called security on her.

Griffin points to the statements made by Ennis and Chenoweth referring to her as "scary and intimidating," as evoking the odious stereotype of the "angry Black woman" that a jury could reasonably find to be racially motivated and evidence of racial discrimination (Filing No. 50 at 8). Even if these statements were racially insensitive--which they were--they are not enough to establish discriminatory motive because they were not made by Sharp, who was the supervisor that terminated Griffin. *See Perez v. Thorntons, Inc*., 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision.").

Griffin's attempt to position Haney and Van Valkenburg as similarly-situated white employees who received better treatment because they were "allowed to abuse [Griffin]" and "were not disciplined" also falls short. *See David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) ("[W]hether employees are similarly situated is a flexible, common-sense, and factual inquiry.") In the analysis to determine whether employees are similarly-situated, the Court considers such factors as "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id*. at 226.

Griffin does not offer evidence to show that her potential comparators were subject to the same standards nor does she demonstrate that Haney and Val Valkenburg were materially comparable but received treatment that was more favorable. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) ("A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'"). Griffin's admission that she has no knowledge of the disciplinary records or histories of her potential comparators sinks her chances to make the *prima*

*facie* showing of racial discrimination under *McDonnell Douglas* because she cannot demonstrate that they were treated better (*see* [Filing No. 47-1 at 38](#)). The evidence Griffin submits does not support her contention that Haney and Van Valkenburg were not disciplined for their verbal attacks on her nor does Griffin demonstrate that the two white employees were similarly-situated.

The collective evidence proffered by Griffin, taken as a whole, would not allow a reasonable factfinder to conclude that Griffin's race was the "but-for" cause of her termination.

Therefore, the Court **grants** CHN summary judgment on Griffin's claim of intentional racial discrimination under Section 1981.

### 2.    **Title VII**

Similar to Section 1981, Title VII commands that it is "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e– 2(a)(1); *see Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1738 (2020). In 1991, Congress amended Title VII, adding that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Boyd v. Illinois State Police*, 384 F.3d 888, 895 (7th Cir. 2004); *see also* 42 U.S.C. § 2000e–2(m).

As held by the Seventh Circuit, "[*all* discrimination cases present the same basic legal inquiry: [A]t the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz*,

834 F.3d at 765) (emphasis in original). In *Ortiz*, the Seventh Circuit overruled a series of cases that divided discrimination claims into "direct" and "indirect" categories and designating different legal standards to each. *See* 834 F.3d at 765 ("Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.').

In determining discrimination cases, pursuant to the well-known burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) [2], a plaintiff must first show that "(1) [she] is a member of a protected class; (2) [she] performed [her] job to [her] employer's expectations; (3) [she] suffered an adverse employment action; and (4) one or more similarly situated individuals outside [her] protected class received better treatment." *Ferrill*, 860 F.3d at 500 (7th Cir. 2017) (citation omitted). If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.*

CHN presents two reasons why Griffin's discrimination claim fails as a matter of law: (1) Griffin fails to establish a *prima facie* claim of race discrimination because she fails to identify any similarly-situated, non-African-American employees who were treated more favorably (Filing No. 46 at 11), and (2) even if Griffin could establish a *prima facie* claim, she cannot prove that CHN's reason for terminating her was pretextual in nature. *Id.* at 13.

---

[2]The Seventh Circuit continues to recognize the *McDonnell Douglas* burden shifting framework, sometimes referred to as an "indirect" means of proving employment discrimination, as one method for presenting circumstantial evidence. *Ortiz*, 834 F.3d at 765 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole. That conclusion is consistent with *McDonnell Douglas* and its successors.")

Griffin responds by presenting the circumstantial evidence discussed above. Namely, the comments by Ennis and Chenoweth, Sharp's warnings about calling security on her, and Haney and Van Valkenburg's alleged favorable treatment (Filing No. 50 at 8).

Again, two of the four elements of the *McDonnell Douglas* framework are not in dispute. It is undisputed that Griffin is a member of a protected class as an African-American woman and that she suffered an adverse employment action when she was terminated. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) ("[A] termination is undoubtedly an adverse employment action."). To meet her burden, Griffin must show she was meeting CHN's employment expectations and there were other similarly-situated non-African-American employees that were treated more favorably. There is sufficient designated evidence to establish that Griffin was meeting her employment expectations. However, the Court has already determined that Griffin cannot demonstrate there were other similarly-situated, non-African-American employees who received better treatment and thus, she cannot prevail on her racial discrimination claim under Title VII.

Therefore, the Court **grants** CHN summary judgment on Griffin's claim of racial discrimination under Title VII.

## B.     Retaliation

The Court reviews both Title VII and Section 1981 retaliation claims under the same framework. An employer may not retaliate against an employee because that person opposes a practice prohibited by Title VII, files a charge of discrimination under Title VII, or testifies, assists, or participates in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e-3. Section 1981 protects the right of all persons "to make and enforce contracts" regardless of race. 42 U.S.C.

§ 1981(a). Section 1981 also authorizes claims for retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008).

Employees can prove retaliation claims in two ways: either through the direct method or the indirect method. "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) [she] engaged in a protected activity, (2) [she] suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citation omitted). Alternatively, the indirect method of proof in a retaliation claim, like one for discrimination, uses the burden-shifting *McDonnell Douglas* framework.

CHN asserts that Griffin's retaliation claims fail as a matter of law under the direct method because Griffin cannot establish the requisite causal link between her complaint to HR for racial discrimination and her termination (Filing No. 46 at 16). CHN also maintains that Griffin cannot establish that CHN's reason for terminating her was pretext for retaliation because CHN presented evidence of a non-discriminatory and non-retaliatory reason for Griffin's termination – specifically her "abandonment of her job duties." *Id.* at 18.

Griffin responds that she satisfies all three prongs of the retaliation inquiry using the direct method. Griffin argues that she unquestionably engaged in statutorily protected activity when she (1) filed a complaint for discrimination with HR on January 4, 2019, (2) informed Fawcett that she would contact the EEOC on January 7, 2019, and (3) informed Sharp that she would file a retaliation complaint against her at CHN's Business Office on the morning of January 8, 2019 (Filing No. 50 at 6). Griffin argues that she suffered an adverse employment action when "Fawcett made the decision to terminate" her on January 8, 2019 for "abandoning her job," despite the fact

that "Ennis gave Griffin permission to leave and Ennis and Griffin worked together to find her replacement for the rest of her shift." *Id.*

Regarding the causal connection element of the retaliation inquiry, the Seventh Circuit explains that "either direct or circumstantial evidence can be used" under the direct method of proof to show that an employer was motivated to terminate an employee because of her protected activity. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012). The Seventh Circuit has held that "circumstantial evidence of retaliation may include 'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Id*. at 307 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir.2007)).

Griffin contends there is "suspicious timing between the protected activity and the adverse action." (Filing No. 50 at 7.) She points out that the Seventh Circuit has stated "a two to three-day gap between protected activity and adverse action is sufficient by itself to prove a causal connection." *McClendon v. Indiana Sugars, Inc*., 108 F.3d 789, 796-97 (7th Cir. 1997). Griffin argues that her termination decision, made only three days after she issued a complaint, one day after she informed Fawcett that she would be filing a complaint with the EEOC, and mere "minutes after she informed Sharp that she was going to file a complaint against her at [CHN's] business office", is clearly suspicious. *Id*. CHN's primary reason for her termination, Griffin contends, has "no basis in fact" because, although CHN claims she was terminated for abandoning her job, she was given permission by Clinical Supervisor Ennis to leave, and Griffin and Ennis worked together to find her replacement for the remainder of the shift. *Id*. Griffin disputes CHN's testimony that Sharp was unaware that Ennis granted her permission to leave because it would be "almost

impossible" given that "Ennis served as a witness to the discharge and signed discharge documentation." *Id.*

Finally, Griffin asserts that there are "other bits and pieces from which an inference of discriminatory or retaliatory intent might be drawn." *Id.* Specifically, Griffin argues that Fawcett made the decision to terminate Griffin despite such decision-making not being a part of her job duties and that Fawcett consistently referred to Griffin in internal emails as the "EEOC person," which Griffin argues is evidence that her EEOC complaint was at the "forefront of Fawcett's mind" and was the reason she was terminated. *Id.*

CHN replies that it does not contest that Griffin engaged in protected activity and suffered and adverse employment action (Filing No. 55 at 6). CHN limits its rebuttal to causation and pretext. *Id.* CHN takes issue with Griffin citing *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789 (1997) as being a "24-year old, pre-*Ortiz*" case that predates the "evidence as a whole" framework found in *Ortiz* (Filing No. 55 at 7). CHN argues that the applicable standard in this case is whether the evidence as a whole would permit a reasonable factfinder to conclude that Griffin's complaint to HR, comments to Fawcett about going to the EEOC, and comments to Sharp about reporting her, caused her termination.

Despite CHN taking issue with Griffin's reference to *McClendon v. Indiana Sugars, Inc.*, CHN concedes it has not been overruled, and the Court finds that it remains applicable in analysis of retaliation claims under Title VII and Section 1981. To that end, the timing of Griffin's termination on the heels of her engagement in protected activity cannot be overlooked. Though suspicious timing alone is not enough to overcome a motion for summary judgment, *see Lewis v. Chicago*, 496 F.3d 645, 656 (7th Cir. 2007), "[o]ccasionally, however, an adverse action comes so

close on the heels of a protected act that an inference of causation is sensible." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 593 (7th Cir. 2020) (citing *McClendon*, 108 F.3d at 796–97).

Moreover, under the *Ortiz* standard, the evidence, presented as a whole, could permit a reasonable factfinder to conclude that Griffin's participation in the stated protected activity caused her termination. In her declaration, Sharp states only that "[a]t the time I made the termination decision, I received no evidence that Ms. Griffin had permission to leave her shift" and Ennis "did not report to me that she gave Griffin permission to leave." (Filing No. 47-6 at 2.) Although CHN asserts that it is "undisputed that at the time she terminated [Griffin], Sharp was unaware of the conversation between [Griffin] and Ennis which [Griffin] may have interpreted as authorization for her to leave her shift." (Filing No. 55 at 8.) Griffin disputes this as "almost impossible". (Filing No. 50 at 7.)

There is clearly a genuine issue of material of fact in dispute as to whether Griffin "abandoned her job" as alleged by CHN (presented as the primary reason for her termination) or whether Griffin was authorized to leave and secured coverage for the remainder of her shift before clocking out. In addition, the circumstances surrounding Griffin's abrupt termination after she was originally set to receive a written warning gives credence to a causal link between the protected activity Griffin engaged in and her subsequent adverse employment decision. In viewing the evidence in a light most favorable to Griffin, Griffin has raised genuine issues of material fact in dispute that foreclose summary judgment in favor of CHN on her retaliation claims. Accordingly, the Court **denies** summary judgment for CHN on Griffin's retaliation claims under Section 1981 and Title VII.

# IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** CHN's Motion for Summary Judgment (Filing No. 45). CHN is granted summary judgment on Griffin's Section 1981 and Title VII racial discrimination claims and Counts I and Count II are dismissed. Griffin's retaliation claims pursuant to Section 1981 and Title VII in Counts III and Count IV of her Complaint may proceed beyond the summary judgment stage.

    **SO ORDERED**.

Date:  7/14/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Amber K. Boyd
AMBER K. BOYD ATTORNEY AT LAW
amber@amberboydlaw.com

Sarah Elizabeth Larimer
AMBER BOYD LAW
sarah@amberboydlaw.com

Christina M. Kamelhair
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
christina.kamelhair@ogletree.com

Brandon M. Shelton
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
brandon.shelton@ogletreedeakins.com